## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

In re:                                   )
                                         )
Sandpoint Cattle Company, LLC            )        Chapter 11
                                         )
                    Debtor.              )        No.

Sandpoint Cattle Company, LLC, filed a case under Chapter 11 of Title 11 of the United States Code. The debtor, Sandpoint Cattle Company, LLC, together with Clark Compher and George Londos[1] (collectively "Sandpoint" or debtors), filed objections to Claim Nos. 6 and 9, filed by Alger Cattle Company, LLC, and Ray-Mar Farms ("Alger"). On March 10–13, 2014, I held an evidentiary hearing on the objections to the claims. I now enter my findings of fact and conclusions of law and order relief as set forth below.

### A.   Introduction

This case was tried before the undersigned as a United States District Judge, sitting by designation for the District of Nebraska. I withdrew the reference to the bankruptcy court pursuant to 28 U.S.C. § 157(d) and tried the case in the United States District Court for the District of Nebraska.[2]

---

[1]Clark Compher and George Londos are interested parties as members of Sandpoint Cattle Company, LLC, and as personal guarantors of the promissory note that is the subject of Claim No. 6.

[2]For administrative convenience, all pleadings and filings to date have been filed in the bankruptcy case with the clerk of the bankruptcy court for the District of Nebraska. For purposes of the entry of this order and judgment, I will request the clerk of the United States District Court for the District of Nebraska to open a file for Sandpoint Cattle Company, LLC, and to docket this order and judgment in the district

The parties have presented me with a number of issues related to the disputed claims. Some of these issues were resolved at the conclusion of the hearing on March 13, 2014. Specifically, Claim No. 9, filed as an unsecured claim in the amount of $6,393,028, was allowed in the amount of $273,294. The balance of the claim was disallowed. This opinion will address further adjustments to Claim No. 9, as an unsecured claim, that need to be made before reaching a final unsecured claim amount.

In addition, the parties disputed whether the asset purchase agreement ("APA"), which is the subject of this litigation, was an integrated agreement. At the hearing's conclusion, I ruled it was and could not be modified by parol evidence. Consequently, the agreement forms the basis of the contract between the parties, subject to two possible modifications. Those modifications include determining how to apply a settlement agreement relating to cattle that had a genetic defect known as "AM," and deciding whether there was a mutual mistake in setting the sale price.

As to both Claim Nos. 6 and 9, I have been presented with a myriad of issues relating to claimed offsets, credits, additions, the reasonableness of the disposition of collateral, appropriate pre-petition and post-petition interest rates, mutual mistake, and various other asserted adjustments under the APA. I believe the most efficient way to address these issues is to set forth as findings of fact a general background section describing the relationship of the parties and the genesis of this dispute. I will then address the various issues in separate sections and make appropriate findings of fact and conclusions of law as may be required to resolve each dispute.

———————————

court accordingly.

## B.    Background

Raymond Alger owns Alger Cattle Company, LLC, one of the creditors in this case. Alger is 73 years old and has more than 60 years of experience in the cattle business. His home operation is in California and partially operates under the name "Ray-Mar Farms." About 20 years ago he became involved in the purebred Angus business. Currently, Alger, together with family members and other partners, runs extensive cattle and dairy operations in both California and Texas.

In 2004, Alger met John Widdowson. Widdowson was involved in operating a 12,000-acre ranch known as "Sandpoint Cattle Company" in Lodgepole, Nebraska. The ranch's primary business consists of cultivating Angus cattle and genetics to sell around the world. Specifically, the ranch produces purebred Angus bulls to sell to commercial ranches to improve herd quality and sells bull semen and fertilized embryos from the purebreds as well. Eventually, Alger became convinced to purchase all of Sandpoint's assets, including its land, cattle inventory, machinery, and the like. Upon purchasing the ranch, Alger retained Widdowson to run its day-to-day operations.    Widdowson's job responsibilities included, among other things, supervising the ranch workers, conducting periodic inventories, and breeding cattle to improve genetic quality.

In 2007, Widdowson met Michael Deutsch, a tax accountant and investor in cattle ranches. Deutsch told Widdowson that Deutsch and a group of investors were interested in buying the ranch from Alger. Widdowson arranged for Deutsch to meet with Alger to discuss a potential deal. In the course of negotiations, Alger told Deutsch that he was willing to sell the entire ranch and its inventory for $16,000,000. Negotiations for the ranch continued through the summer of 2008. Deutsch and his investor group ultimately made a deal with Alger to purchase the ranch.

3

The new owners created an entity called Sandpoint Cattle Company, LLC, to legally own the ranch.  Sandpoint designated Widdowson to continue to manage the ranch.  The new owners took physical possession of the ranch on August 1, 2008, but the ranch sale did not close until November 19, 2008.  As such, Sandpoint was in control of the ranch for more than three and one-half months before the deal closed and Sandpoint became the ranch's new owner.

At the closing, representatives from Sandpoint and Alger signed and executed several documents.  Widdowson signed the APA on Sandpoint's behalf.  As detailed in the APA, the final agreement between Sandpoint and Alger was that Alger would sell the ranch's non-real estate "assets" (as defined in the APA) for $11,343,000.  In a separate real estate purchase agreement, Alger agreed to sell the real property constituting the ranch for $4,657,000.  Thus, the total sale price was $16,000,000.  Deutsch explained in his testimony how the parties settled on that amount:

> Plourde: Okay. And the purchase price that you agreed to, how did that relate to, if at all, to the 3/15 inventory and the list of subsequent purchases?
>
> Deutsch: The 3/15 inventory, plus the subsequent purchases, plus our evaluation of the equipment, plus our evaluation of the land, based upon whether it was irrigated or not irrigated acres, was all part of determining the purchase price of 16 million dollars.
>
> . . .
>
> Plourde: And can you tell me the process of determining that number?
>
> Deutsch:  Of determining the allocation of purchase price?
>
> Plourde: Yes.

4

Deutsch: We started with the total number, and then what we did is we started calculating all of the things that we knew. So we went through and figured out all of the equipment. We had John [Widdowson] make a complete listing of all the equipment, so we would determine the value of the equipment. We had John go through and make a complete mapping of all of the fencing that was there, so we could determine the exact linear foot of fencing because, from an accounting standpoint, fencing is depreciable where land isn't, and that was quite an arduous process. And then we took the land, based upon what we understood the fair market value of the land was from a couple of different sources, and we backed into the remaining number which was the number allocated to cattle.

TT, Day 3, pg. 103, ln. 13–20; id. at pg. 106, ln. 7–23.[3]

To determine how to value the assets, Widdowson supervised the creation of a detailed cattle inventory that was current as of March 15, 2008 (the "March 15 inventory"). The inventory listed all cattle on the ranch as well as embryo and pregnancy counts. As part of the inventory, a value was assigned to each head of cattle on the ranch, with the reference date for the asset's value being December 2007. The parties all understood that there would be some fluctuation in the number of cattle between the March 15 inventory and the date of closing due to births, deaths, sales, and purchases. Alger created a separate document to record the ranch's new purchases after the March 15 inventory (the "new purchases document"). The new purchases document was intended to reflect all new purchases of cattle after the March 15 inventory up till July 31, 2008. The cut-off date for the new purchases document was the day before Sandpoint took control of the ranch. Sometime in July 2008, Widdowson compared the new purchases document with the March 15

_____

[3]For the purposes of this opinion and order, I cite the official transcript from the March evidentiary hearing. See Doc. 498. Because this case originated in the bankruptcy court for the District of Nebraska, citations to the docket are from that original case, No. 13-40219.

inventory and identified numerous duplicate entries. That is, cattle appeared on both the March 15 inventory and the new purchases document. Several months after the closing, an analysis of the two documents was conducted, which determined that there was $1,016,319.00 worth of cattle double-listed on the March 15 inventory and the new purchases document.

Alger agreed to finance a portion of the purchase price. He loaned $10,800,000 at 5% annual simple interest to Sandpoint in exchange for a security interest in the ranch's real and personal property. Under the terms of the promissory note, Sandpoint promised to pay Alger $600,000 annually from 2008 until 2012, with the annual amount increasing to $800,000 from 2013 until 2016.[4] All unpaid principal and interest was due on December 31, 2017. Pursuant to the note's forbearance provisions, see ¶¶ 3–5, portions of the annual payment could be "deferred" to a later date. In return, the deferred amounts were subject to an increased interest rate of 8%. The note also specified that if Sandpoint defaulted on any payment, an acceleration clause would be triggered and a 10% default interest rate would apply instead of the 5% rate.

As will be set forth in more detail below when resolving the claims disputes, Sandpoint started missing payments under the APA and promissory note within a fairly short time after the transaction was consummated. The failure to make timely payment was attributable, at least in part, to a severe drought in western Nebraska. The parties executed a separate forbearance agreement, see Doc. 329, which was made effective March 1, 2012, in an attempt to address delinquent loan payments. At about the same time, a number of disputes arose relating to issues surrounding the APA. These included the double-counted cattle mentioned above, a problem with

---

[4] The loan also required Sandpoint to pay an additional $500,000 on December 31, 2012.

6

certain cattle that had a genetic defect known as "AM carrier," how certain payments that were made were to be applied, and a myriad of other more minor issues.

One of the more difficult issues in this case is when and whether certain disputed issues were settled. As discussed below, there were multiple meetings at which the parties attempted to hammer out a resolution of a whole list of issues. There is evidence in the record that the parties were able to reach a satisfactory resolution as to some of the issues, while other "agreements" appeared to be more in the nature of attempts at a global settlement. In other words, Party A will agree to X, but only if Party B agrees to Y. Other issues did not appear to be contingent upon any other agreements. One of the tasks before me will be to sort out which issues were resolved pre-petition, and which remained open for negotiation after Sandpoint filed its bankruptcy petition.

An unusual aspect of this case is the fact that two of its key players each represented opposing parties to this dispute at various times. As previously indicated, Widdowson was the ranch manager for Alger until the time the ranch was sold. He then became an employee and manager for Sandpoint Cattle Company, LLC. In fact, Widdowson is the individual who signed the closing documents on behalf of Sandpoint.[5] Another key person in this dispute is Don Ozenbaugh. Ozenbaugh is related by marriage to Alger and was acting as his representative in the negotiations leading up to the sale of the ranch. Ozenbaugh continued to represent Alger through at least the end of 2010. However, at some point thereafter, he apparently attempted to take on a "mediator" role to resolve the various disputes that had arisen. He then, over the objection of Alger, became a consultant for Sandpoint and represented their interests in negotiations in various attempts to settle the claims. To the extent it becomes significant, I find that Widdowson represented Alger through August 1,

---

[5] Although, for reasons not entirely clear from the record, Widdowson was not allowed to see or read the documents prior to executing them.

7

2008, and was a representative for Sandpoint thereafter. Likewise, I find that Ozenbaugh was a representative and had binding authority for Alger through December 31, 2010, and became a representative for Sandpoint after that date.

On February 6, 2013, Sandpoint filed a Chapter 11 bankruptcy petition in the United States District Court for the District of Nebraska. Alger later filed Claim No. 6, asserting a secured claim valued at $12,274,917.86. Claim No. 6 was for amounts owed under the $10,800,000 promissory note, amounts claimed to be owed under the terms of the March 1, 2012 forbearance agreement, and interest that had accrued on the total unpaid debt.

On June 28, 2013, Sandpoint filed a motion seeking to abandon 2,453 cattle to Alger. The motion alleged that "[r]equiring Debtor to continue to maintain collateral for the Alger Entities would not bring any benefit to the bankruptcy estate and would, instead, be burdensome because such maintenance would be very costly, and because the collateral is 100% encumbered." Widdowson's testimony at the March 2014 hearing corroborated the fact that the ranch could no longer sustain the amount of cattle there:

Plourde: In July of 2008 [sic] was the ranch able to sustain these cattle?

Widdowson: Can you define sustain?

Plourde: Was it your plan to leave the cattle on the ranch at that time whether or not they were abandoned?

Widdowson: Whether the cattle were going to be abandoned ----

Plourde: Yes.

Widdowson: -- or not a large, large portion of the inventory would have to be moved to some other place.

8

TT, Day 4, pgs. 74–75, ln. 23–25, 1–6.  On July 10, 2013, Sandpoint filed an amended motion seeking to abandon 2,376 cattle.  After hearing arguments from both sides on July 24, 2013, the bankruptcy court granted the amended motion and ordered Alger to remove 2,376 cattle from the Sandpoint ranch by August 13, 2013.  Prior to the March 2014 hearing, virtually all of the abandoned cattle had been liquidated, with the exception of a relatively small number that Alger retained.

## C.   Commercial Reasonableness of Post-Abandonment Cattle Sales

One of the most significant issues I must determine in this case is whether the manner in which Alger liquidated and accounted for the sale proceeds of the abandoned cattle was "commercially reasonable."   Commercial reasonableness is a question of state law.  See City Nat. Bank of Fort Smith, Ark. v. Unique Structures, Inc., 49 F.3d 1330, 1333 (8th Cir. 1995) (applying state law to decide whether the sale of collateral under Article 9 of the U.C.C. was commercially reasonable); Neb. Rev. Stat. U.C.C. § 9-610(b) ("Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable.").  I turn to that issue first in determining the allowed amount of Claim No. 6.

As mentioned above, the bankruptcy court granted Sandpoint's motion to abandon 2,376 cattle to Alger and ordered Alger to remove the cattle from the Sandpoint ranch by August 13, 2013.[6]  Sandpoint hired Eddie Sims to appraise the

---

[6]Sandpoint relies heavily on Judge Mahoney's statement during a July 2013 cash collateral hearing that the abandoned cattle would be valued as of the time they were placed on the truck and taken off the Sandpoint ranch.  Because of this statement, Sandpoint argues that Eddie Sims's $8 million appraisal of the cattle should be the value I assign to the abandoned cattle for purposes of computing the unpaid balance of the $10.8 million loan.

- 9 -

cattle prior to abandoning them to Alger. Sims has worked in the purebred and commercial cattle business for 46 years. He currently owns National Cattle Services, which provides various services, including cattle appraisals. Sims inspected the Sandpoint cattle July 8–10, 2013. TT, Day 3, pg. 58, ln. 8-10. Sims appraised the 2,376 cattle as worth $7,979,950 at the time.[7]

---

I reject Sandpoint's argument for a few reasons. First, I question whether Judge Mahoney's comment carries the weight Sandpoint attributes to it. The comment referred to was made in the course of back and forth between counsel over how the cattle were to be delivered, how the deliveries were to be made, who was to pay for trucking, the time allowed for delivery, and other acrimoniously-litigated issues. I do not believe that Judge Mahoney's comment can be read to sanction a valuation of the cattle based upon Sims's appraisal.

Second, even if Judge Mahoney's comments are to be construed as setting the date of abandonment as the date for valuation of the collateral, it says nothing about how that valuation is to be made. As indicated in footnote 7, I find the appraisals performed by debtor's appraisers to be of little use in determining value. At the end of the day, the best measure of value is the amount the cattle were sold for in a commercially reasonable manner or should have been sold for if a sale was not commercially reasonable. Judge Mahoney's comment is merely an acknowledgment that Alger obtained title and possession of the cattle as of the date the cattle were delivered as a result of the abandonment. That is the date credit for the cattle will be given. The comment says nothing about the method of valuation or amount of credit to be given to the cattle. Accordingly, I reject Sandpoint's argument.

[7]I discount Sims's appraisal for several reasons. First, the estimate was based on "current sales" and "everyday marketing." TT, Day 3, pgs. 58–59, ln. 24–25, 1–2. Because of the widespread drought, however, many ranches were selling animals to make their herds smaller. This naturally creates lower-than-normal prices in the market. Basing the estimate on typical marketing would also unnaturally inflate the prices because abandoning 2,376 cattle is atypical, and it was virtually impossible for Alger to sell the cattle using standard marketing practices. Second, Sims's estimate is based on additional optimal conditions that, either by stipulation of the parties or impossibility, did not occur, including: selling the cattle at the most desirable time of year; selling the cattle off in small numbers so as not to flood the market; selling the

- 10 -

Alger traveled from the Ray-Mar ranch in California to Sandpoint to retrieve and sell the cattle. Alger then disposed of most of the cattle at sales between August 2013 and January 2014. The various cattle sales have netted $4,677,348.88 to date. Alger claims he accrued $1,328,107.82 in expenses related to the abandonment and sale of the cattle. The net proceeds from the cattle abandonment according to Alger is therefore $3,384,979.87.

Alger argues that he sold all the cattle in a commercially reasonable manner, and that because he did so, he is entitled to a deficiency judgment. Sandpoint argues that Alger did not conduct the sales in a commercially reasonable manner and that he is therefore barred from receiving a deficiency judgment for the remaining balance due on the promissory note.

### 1.    Nebraska's Adoption of the Uniform Commercial Code

Nebraska's adoption of the Uniform Commercial Code (U.C.C.) governs my analysis of whether Alger disposed of the cattle in a commercially reasonable manner. The U.C.C. requires that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Neb. Rev. Stat. U.C.C. § 9–610(b). I consider several factors when determining if the sales were commercially reasonable, including: "(1) whether the timing between the sale and notice was too short or too long; (2) whether the seller advertised the sale; (3) whether the sale was in a proper place; (4) whether the seller permitted necessary inspections by prospective bidders; (5) whether the seller performed necessary repairs; and (6) whether the seller held the sale at the same time and location as

purebred Angus cattle at the Sandpoint ranch; and selling the cattle under the Sandpoint name. See generally TT, Day 3, pgs. 56–81. These assumptions inflated Sims's appraisal, and I find these various factors render the appraisal unreliable to the extent that Sandpoint relies on it to prove the various sales were not conducted in a commercially reasonable manner.

advertised." Wells Fargo Bus. Credit v. Environamics Corp., 934 N.E.2d 283, 289 (Mass. App. Ct. 2010); see In re Youngblood, 167 B.R. 870, 874 (Bankr. W.D. Tenn. 1994) (listing factors, including purchase price). In addition, "the adequacy or insufficiency of the price" is another factor I consider, First Westside Bank v. For-Med, Inc., 529 N.W.2d 66, 70 (Neb. 1995), but "no single factor, even price, will conclusively determine the commercial reasonableness of a secured party's actions," Bezanson v. Fleet Bank-NH, 29 F.3d 16, 20 (1st Cir. 1994).

The secured party "may dispose of collateral by public or private proceedings, by one or more contracts, as units or in parcels, and at any time and place and on any terms." Neb. Rev. Stat. U.C.C. § 9–610(b). "Whether a sale of collateral was commercially reasonable . . . is a question of fact." First Westside Bank, 529 N.W.2d at 68. Nebraska has adopted the rebuttable presumption rule, which means that once the debtor raises the issue of commercial reasonableness, the burden is on the secured party to establish that the sale of the collateral complied with the U.C.C.'s requirements. See Neb. Rev. Stat. U.C.C. § 9–626(2). Because Sandpoint challenges the commercial reasonableness of the various cattle sales, Alger must prove that the sales were commercially reasonable to receive a deficiency judgment. If Alger does not meet his burden, Sandpoint's liability is limited "to an amount by which the sum of the secured obligation, expenses, and attorney's fees exceeds the greater of the amount of proceeds that would have been realized had the non-complying secured party proceeded in accordance" with a commercially reasonable sale. See id. at (3)(B).

2.   Notice Issue

Nebraska's U.C.C. provides that a secured party "shall send" reasonable notice of the intent to dispose of collateral to, among other persons, the debtor. Neb. Rev. Stat. U.C.C. § 9–611(b). Notice is sufficient if it does the following:

(A)   describes the debtor and the secured party;

(B)   describes the collateral that is the subject of the intended disposition;

(C)   states the method of intended disposition;

(D)   states that the debtor is entitled to an accounting of the unpaid indebtedness and states the charge, if any, for an accounting; and

(E)   states the time and place of a public disposition or the time after which any other disposition is to be made.

Neb. Rev. Stat. U.C.C. § 9–613(1).

Sandpoint argues that adequate notice of a sale is not merely one factor in the commercial reasonableness analysis but is a prerequisite to recovering a deficiency judgment at all.  Sandpoint quotes First National Bank of Bellevue v. Rose for the proposition that a creditor's "failure to give proper notice of the sales of the collateral is an absolute bar to the recovery of a deficiency judgment."  249 N.W.2d 723, 726 (Neb. 1977).

Prior to 1991, Nebraska's U.C.C. did not specify how to treat a secured party's failure to provide notice.  This gap was filled by Nebraska common law, which established that a party's failure to provide notice absolutely barred a creditor from obtaining a deficiency judgment.  See, e.g., Mason State Bank v. Sekutera, 461 N.W.2d 517, 523 (Neb. 1990) (per curiam) ("[C]ompliance with the requirements of the Uniform Commercial Code for notification as to the disposition of collateral is a condition precedent to a secured creditor's right to recover a deficiency, . . . the burden of proof is on the secured party to prove compliance with the statutory notice requirements, and . . . failure to give reasonable notice is an absolute bar to the recovery of a deficiency.").  Sandpoint's reliance on pre-1991 cases is misplaced, however, because the U.C.C. has been revised several times since those cases were decided.  See, e.g., Old Mill Toyota, Inc. v. Schroeder, 1993 WL 259350, at *7 (Neb. Ct. App. 1993) (unpublished) (noting that recent U.C.C. changes "*reflected the*

- 13 -

*Legislature's rejection of any 'absolute bar' rule that had been announced in* <u>Rose</u> . . . to prevent the recovery of deficiency judgments when notice of a sale had been inadequate" (emphasis added)).

In 1991, the Nebraska Legislature added U.C.C. section 9–504(7), which stated that complying with the notice provisions "shall not be a condition precedent to the right of a secured party to recover any deficiency[.]"   <u>Howard Kool Chevrolet, Inc. v. Blomstedt</u>, 511 N.W.2d 222, 227 (Neb. Ct. App. 1994).  The Nebraska Legislature adopted U.C.C. section 9–504(7) to "provide a greater degree of fairness in commercial transactions by eliminating the punitive 'bar to deficiency judgment' rule." <u>Id.</u> at 228.  A more recent revision to the U.C.C., though, is once again silent on the effect a failure to provide required notice has on a creditor's ability to recover a deficiency judgment.  Nebraska courts have yet to address this latest revision, but I decline to infer that the absence of Section 9–504(7) in the latest version of the U.C.C. means that the drafters intended to resurrect the absolute bar rule.  Indeed, the U.C.C. commentary says the exact opposite. <u>See</u> U.C.C. § 9–101, official comment ("For non-consumer transactions, Section 9–626 rejects the "absolute bar" test that some courts have imposed; that approach bars a noncomplying secured party from recovering any deficiency, regardless of the loss (if any) the debtor suffered as a consequence of the noncompliance."); <u>Herman v. Midland AG Service, Inc.</u>, 264 N.W.2d 161, 171 (Neb. 1978) (citing U.C.C. commentary as persuasive authority); <u>TCFIF Inventory Fin., Inc. v. Appliance Distributors, Inc.</u>, No.12-C-332, 2014 WL 806961, at *11 (N.D. Ill. Feb. 28, 2014) (applying Illinois law) ("But the secured creditor is not barred from bringing a deficiency action against the debtor or guarantor merely because notice was not given prior to disposition.").

I must apply the law as I believe the Nebraska Supreme Court would. <u>See</u> <u>Grassmueck v. Am. Shorthorn Ass'n</u>, 402 F.3d 833, 839–40 (8th Cir. 2005) ("If the path that a state court would follow when presented with a novel question is unclear, then we may decide the issue by predicting what the state court would do.").  I find

persuasive the fact that the most recent Nebraska cases to address the issue, applying the previous version of the U.C.C., considered insufficient notice as simply one factor in the overall commercial reasonableness analysis rather than an absolute bar to recovery. See Howard Kool Chevrolet, 511 N.W.2d at 227; Old Mill Toyota, Inc., 1993 WL 259350, at *7. Cf. 4 James R. White & Robert S. Summers, Uniform Commercial Code § 34-12, (6th ed. 2010) ("In general we are unsympathetic to debtor claims that they have been injured by the creditor's failure to give adequate notice."). And I find persuasive the commentary to the U.C.C., which suggests that deficiencies in complying with the default rules affect the overall commercial reasonableness inquiry and are not an absolute bar to recovery. See U.C.C. § 9–101, official comment.

I conclude that if the secured party has failed to comply with the U.C.C.'s notice requirements, then the U.C.C. provision that discusses the effect of non-compliance with the statute as it relates to the disposition of collateral applies. That provision is found at Neb. Rev. Stat. U.C.C. § 9–626, which states when a secured party's compliance with the U.C.C.'s requirements is challenged, a rebuttable presumption arises that the value of the collateral sold was equal to the total amount of debt that the collateral secured. Therefore, in order for Alger to receive a deficiency judgment, he bears the burden to prove that he has sold the collateral in a commercially reasonable manner, and I will look at the adequacy of notice as one of several factors in deciding whether Alger should receive a deficiency judgment.

In this case, Alger mailed three separate notices to Sandpoint to alert them of various planned sales: (1) notice of a private sale of 1,321 cattle in August 2013, Exhibit 352; (2) notice that 500 cattle mentioned in the private sale would instead be sold in a public auction at the Ogallala sales facility, Exhibit 353; and (3) notice stating that Alger was disposing of 1,055 cattle at a private sale in September 2013, Exhibit 354. These notices, however, do not line up with how the cattle were sold. In addition to the notices just listed, Alger supplied a declaration in October 2013,

Doc. 264, which was entered into evidence on November 1, 2013, Doc. 269.  In this declaration, Alger describes his intent to sell 1,145 cattle at the Ogallala Livestock Auction Market (the "Ogallala sale barn") on December 9 and 10, 2013, which provided the parties with actual notice of the upcoming collateral disposition. I will discuss below what factor, if any, any insufficient notice plays in assessing the commercial reasonableness of the cattle sales.

### 3. Abandoned Cattle

Alger faced a number of very difficult and immediate problems when Judge Mahoney ordered the abandonment.  He was about to receive over two-thirds of Sandpoint's cattle inventory (with no place to take them), and only a short time to arrange for pick-up, transportation, and temporary housing prior to selling the animals. And in assessing commercial reasonableness in this case, I note that some of the problems with the cattle sales were created by Sandpoint itself. These included the fact that such a large number of cattle were being disposed of at the time of severe drought in western Nebraska. This left little ranch land outside Sandpoint to house the cattle on. Alger had asked to have the cattle remain at the Sandpoint ranch, and he offered to pay the expenses of feed and maintenance while they remained there so that there could be an orderly disposition of the cattle. However, that request was refused. See TT, Day 2, pgs. 21–22, ln. 18–25, 1–20; Day 4, pg. 78, ln. 1–9. Sandpoint also refused a request to sell the cattle under the Sandpoint name. See TT, Day 2, pgs. 66–67, ln. 12–25, 1–3; Day 4, pg. 78, ln. 1–9. Significantly, all the testifying experts agreed that the best way to dispose of cattle is on a ranch (as opposed to a commercial facility), and that the Sandpoint name has value and would have raised the sale price of the cattle had they been allowed to be sold under that name.

Another immediate problem Alger faced was the fact that over 700 head of the abandoned cattle were bred heifers.  These are young female cows that are about to

give birth. In many cases, the cattle were literally within days of calving. In fact, 29 calved within two weeks of abandonment. There was some suggestion at the March 2014 hearing that the fall-bred heifers should have been sent to California to calve. However, even the debtor's experts did not support that idea, and Alger's experts indicated that putting cows that were about to give birth on a truck for cross-country transportation bordered on the inhumane.

Sandpoint argues Alger should have done something "different" than what he did but offers no viable suggestion as to what that "different" should be. There was some suggestion that the cattle should have been shipped to California and sold at the Ray-Mar ranch. However, some of the sales that actually occurred at the Ray-Mar ranch are now the subject of another Sandpoint argument that the sales were not commercially reasonable. In any event, that was not a feasible alternative since California was experiencing just as bad, if not worse, drought conditions as western Nebraska.

There was also a suggestion that selling at a sale barn is not the optimal way to sell Angus cattle. However, even the Sandpoint experts could not point to a feasible alternative if sale at the ranch was not possible. There was a suggestion of a sale at a local fairgrounds, but no real explanation as to why that would be better than an established sale barn with sorting pens, sales arena, etc. At the end of the day, the only real alternative proposed appears to be that Alger should have gone into the cattle business in Nebraska with the abandoned cattle. Essentially, as I understand the argument, Sandpoint contends Alger should have calved out all the fall-bred heifers and held the entire herd until the spring in hopes that the market would improve (which, in fact, it did). However, as explained above, I find nothing in the Nebraska U.C.C. that requires a party to hold and bear the expense of collateral for up to 10 months and speculate on market conditions. Indeed, I have no doubt that if Alger held the cattle, and the market went down between August 2013 and March 2014, Sandpoint would argue that Alger should have sold the cattle sooner, and so it

- 17 -

was unreasonable to feed and house nearly 2,400 head of cattle for more than half a year.

With this background in mind, I now turn to the individual sales to determine which were commercially reasonable, and, to the extent any are not commercially reasonable, to adjust the credit to be given to Sandpoint on Claim No. 6.

### 4.    38 Fall-Bred Heifers Kept by Ray-Mar Farms

Around August 1, 2013, immediately after the abandonment, Alger shipped 38 fall-bred heifers to the Ray-Mar ranch in California. He did not try to sell these particular cattle at a public sale, nor did he discuss with Sandpoint his intentions to send these cattle to Ray-Mar. Alger picked these cattle in particular because they were still two months away from giving birth, which allowed them to travel safely to California. Alger assigned each animal a value of $2,500 (for a total value of $95,000). The cattle continue to reside at the Ray-Mar ranch in California. At trial, Alger testified that he believed the price was fair and "if [Sandpoint] want[s] them back for that price, they can send a truck and pick them up." TT, Day 2, pg. 125, ln. 20–21. Alger testified that he "was under a short period of time" and "needed to do whatever [he] felt best to bring the best price [he] could so [he] evaluated them at $2,500 [which was] over what the average brought." TT, Day 2, pg. 126, ln. 1–4; see also Day 2, pg. 124, ln. 23–25 ("[The] 38 at $2500 . . . is referring to the fall bred cows. That is the price I put on the fall bred cows."). Sandpoint argues that Alger cannot prove that it was commercially reasonable for him to take bred heifers on his own and assign them a price without advertising the cattle, soliciting bids from potential purchasers, or providing a reason for setting the price.

I understand that Alger was in a difficult position of suddenly having to sell large numbers of cattle, particularly the fall-bred heifers who needed to be relocated quickly before giving birth. However, I find that Alger's unilateral decision to keep

the fall-bred heifers for himself without discussing the price with Sandpoint or obtaining an outside appraisal of their value was commercially unreasonable. The U.C.C. only allows a secured party to purchase collateral privately "if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations." Neb. Rev. Stat. U.C.C. § 9–610(c)(2). These purebred Angus cattle do not fall into this category, and as such, Sandpoint should theoretically receive some credit against the deficiency judgment that Alger seeks. This number, however, is nearly impossible to quantify, as I find Alger's testimony credible that he assigned each animal a value that was higher than average. In addition, Sandpoint offered no evidence that $2,500 per head was too low, merely suggesting that it was possible the fall-bred heifers could have generated a higher profit if sold publicly rather than privately. The only countervailing testimony is the Sims's appraisal, which I discount for the reasons previously discussed. As such, no additional credit will be applied against the secured debt.

### 5.  167 Bred Heifers to Baldridge

Around August 4, 2013, Alger sold 167 bred heifers to Baldridge, an Angus cattle ranch in North Platte, Nebraska. Each animal was assigned a value of $1,800, totaling $300,600. At trial, Alger testified that he believed $1,800 per head was a good price because the quick sale allowed Alger to save significant expenses, including feed costs and sales commissions. TT, Day 2, pg. 126, ln. 12–24. Alger also testified that the cattle sold to Baldridge "were the bottom end" of the bred heifers. TT, Day 1, pg. 90, ln. 4. Sandpoint argues that Alger has failed to sustain his burden to prove commercial reasonableness because he offered no evidence that the sale was advertised or that he solicited other bids for the cattle.

I find Alger's testimony that the bred heifers were the poorest quality of the abandoned cattle credible, and this supports the relatively low price per animal. The marginal increase in price that would result from keeping and calving the heifers does

not outweigh the increased costs of feeding and sheltering the animals. See Ford Motor Credit Co. v. Solway, No. 84 C 6081, 1986 WL 12809, at *2 (N.D. Ill. Nov. 7, 1986) (unpublished) ("While generally a secured party should not dispose of collateral when the market for it has collapsed if a recover [sic] is likely later, it is also not commercially reasonable for a secured party to hold the collateral for a long time, running up storage charges for which the debtor will be liable."). I find this disposition of cattle was commercially reasonable, and I deny Sandpoint any additional credit toward the deficiency judgment based on this sale to Baldridge.

### 6.   509 Head Sold at Ogallala Sale Barn on August 14, 2013

August 14, 2013, was the first public disposition of the cattle that Sandpoint had abandoned between July 30 and August 13, 2013. Most, but not all, the cattle in this sale were the remaining fall-bred heifers. Alger had these cattle shipped directly from the Sandpoint ranch to the Ogallala sale barn. At trial, Alger testified that he could not take the pregnant animals to Olson's Feed Yard, where he took the other Sandpoint cattle, because that facility had dirt pens that would be inadequate to calve cows safely. TT, Day 1, pg. 86, ln. 1–3. The Ogallala facility had adequate straw pens and personnel to allow these fall-bred heifers to give birth. Id. at ln. 12–21. The total number of cattle sold was 538, because 29 of the cows had already calved. The calves are not included in the figures of abandoned cattle, so I will only look at the 509 that Sandpoint abandoned, which yielded $1,122,410 in proceeds at the sale. Prior to the abandonment, Eddie Sims appraised the cattle as worth an average of $4,554 each, or $2,317,986 total—almost twice as much as they actually brought.

Sandpoint argues that the public sale at Ogallala was a "fire sale" and not commercially reasonable. Sandpoint claims Alger failed to show the sale was commercially reasonable because the advertising was minimal—Alger made some personal phone calls and the sale was advertised online—and only conducted for about 10 days. Sandpoint also claims that the Ogallala sale barn is a commercial beef

barn, not a registered Angus sale barn, so selling the cattle there was unreasonable because it was not the type of venue buyers looking to purchase purebred Angus cattle would expect and thus hinted that the cattle were not high quality. Lastly, Sandpoint argues that Alger should have held on to the cows, helped them give birth, and then sold the cows with their calves at their sides, as this is typical in the Angus industry and would have made the total number of cattle worth more.

I find that this disposition of cattle was commercially reasonable. As discussed with the two other dispositions above, the fall-bred heifers were close to calving at the time of abandonment. Sandpoint would not allow the cattle to remain on the ranch, and Alger could not ship these animals to California. When asked about that possibility at trial, Alger responded that there would have been a high death rate if he had put the pregnant animals on a truck for the twenty-hour drive to the Ray-Mar ranch and intimated that Sandpoint's suggestion to ship the pregnant cattle was inhumane:

> Let's assume that you put them all in a truck and they're going to, according to that date, calve, or a week early, and you sent them on the truck. The cow wants to go in labor so she wants to lay down. Trucks are full. There's really not – no room to lay down. And so she lays down, other cows stand on her, a calf is born, and another cow is going to step on its head or stomach. It's totally ludicrous[.]

TT, Day 2, pgs. 115–16, ln. 24–25, 1–5.

In addition, Alger testified that he looked for space available for the calves but was unable to locate any suitable places close to the Sandpoint ranch. "Nebraska courts have long recognized that in reviewing the price obtained at a sale of secured goods, the trier of fact should consider the *circumstances under which they were sold*[.]" United States v. Pirnie, 339 F. Supp. 702, 711 (D. Neb. 1972) (emphasis added). Alger's decision to utilize the Ogallala sale barn was commercially

reasonable because it was close to the Sandpoint ranch, had space available to accommodate a large number of cattle, had the manpower and cleanliness to safely calve the pregnant cows, and had a good reputation.  Larry Cotton (who will be discussed later) testified that the Ogallala sale barn "would be right at the very top in the nation as far as market reputation, number of head, value per head, et cetera." TT, Day 2, pg. 32, ln. 12–14.  Cotton also testified the sale was commercially reasonable, and I find his testimony credible.  Sandpoint is not entitled to any additional credit against the deficiency relating to this sale.

### 7.    Ray-Mar Bull Sale

Around September 7, 2013, Alger sold 56 bulls from the Sandpoint abandonment at Ray-Mar's annual bull sale in California.  Twenty-two bulls sold at the sale, and those garnered an average $2,626 per animal.  Alger sold the remaining bulls privately.  Eleven bulls sold for an average of $2,845.  Alger kept 3 of the bulls and assigned them each a value of $2,000.[8]  Alger disposed of the remaining 20 bulls for commercial beef, which sold for $28,652.50 (an average of $1,432.63 per animal).  Because this was Ray-Mar's annual sale, the bulls were advertised with flyers and in magazines and trade journals.

Sandpoint claims that Alger likely selected the best bulls to bring to Ray-Mar in California.  Sims appraised the best of the abandoned bulls as worth $5,250 each, so Sandpoint argues the low price shows that the bull sale must not have been conducted in a commercially reasonable manner.  One reason for the low price, Sandpoint suggests, is that the California market was already saturated with bulls, so bringing the bulls to California to sell may have played a role in the low prices.

---

[8]I do not understand Sandpoint to be contesting the value of these 3 bulls that Alger purchased after failing to sell them at the public auction.

I note that Sims's appraisal was conducted at the Sandpoint ranch, and the appraisal price assumed the cattle would be sold at the ranch and under the Sandpoint name—two factors that both sides agreed would garner higher profits. Sandpoint asserts in its post-trial brief that "Sandpoint's bulls typically sell at a substantially higher price than Ray-Mar's bulls." Doc. 514, at pg. 25. Larry Cotton testified that the bulls would have brought a higher price if they had been sold under the Sandpoint name rather than Ray-Mar; however, Sandpoint's counsel agreed that they did not allow Alger to use the Sandpoint name when selling the bulls. I find Sandpoint's use of Sims's appraisal to be suspect because the appraisal assumed favorable conditions that Sandpoint later explicitly disallowed. See TT, Day 3, pgs. 75–76, ln. 18–25, 1–25 (Sims cross-examination). These bulls were understandably worth less because they were sold without the Sandpoint name. Because of this, I do not accept the Sims appraisal as the price a commercially reasonable sale should have brought.

I also reject Sandpoint's contention that Alger flooded the California market with the addition of the abandoned bulls. Like Nebraska, California was experiencing drought conditions. TT, Day 2, pg. 66, ln. 7–8. During trial, Sims admitted that his appraisal did not take into account the fact that the drought forced many ranches to cut down their herds and that other ranches would not have had room for the bulls. TT, Day 3, pg. 73, ln. 21–22 (stating that Sims was not interested in buying the cattle, even though he would have gotten a good deal, because "we don't have room for them after a three-year drought"). Sandpoint seems to suggest that Alger should have held onto the bulls for an additional, unknown amount of time. I disagree. The law does not require a secured party to hold on to collateral for an extended amount of time in the hope that the delay in selling the collateral will result in higher profits. See Pirnie, 339 F. Supp. at 711 ("Generally the law frowns upon the secured party's retaining possession of security for an extended period of time."). For

- 23 -

these reasons, I will not grant Sandpoint additional credit against the deficiency owed to Alger for the bull sale.[9]

8.    Ogallala Livestock Auction Market Sale

Subsequent to the initial sales of the fall-bred heifers and other miscellaneous sales, Alger employed the services of Larry Cotton of Cotton & Associates. Cotton has a lengthy history in managing the sales of registered Angus cattle. Cotton assisted Alger and prepared a marketing plan for the cattle that remained at Olson's Feed Yard and at the Ogallala sale barn. He was involved with Alger's decision to schedule the December sale at Ogallala.

Cotton and his staff assisted in advertising the sale, including preparing a sale catalogue and advertising the sale to prospective purchasers. He also worked with the Ogallala sale barn's marketing system and hired a second internet marketing company to broadcast the sale nationwide so that there were two internet outlets for advertising and bidding. Further, he assisted in preparing and sorting the cattle for sale. On December 9 and 10, 2013, Alger sold 1,210 animals at a public auction held at the Ogallala sale barn. Alger testified that he and Cotton attempted to maximize the value of the cattle slated to be sold at the auction by inseminating them. Prior to the sale, Cotton appraised the cattle as worth $2,370,850. The cattle ultimately sold for $2,579,042. Of the cattle sold at the auction, Alger purchased 36 animals to send back to Ray-Mar farms in California.

Sandpoint makes several arguments regarding the commercial reasonableness of the public auction. First, Sandpoint argues that a large auction like this should not

[9]This sale also shows some of the inconsistency in debtor's position. On the one hand Sandpoint argues Alger should have taken the fall-bred heifers to California and held them for several months, while at the same time arguing that the limited number of cattle Alger did take from this sale to California flooded the market.